Filed 9/30/15  P. v. Duarte CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GIOVANNI DUARTE,<br><br>    Defendant and Appellant. | H040925<br>(Santa Clara County<br>Super. Ct. No. C1103556) |

## I.    INTRODUCTION

Defendant Giovanni Duarte appeals after a jury convicted him of second degree murder.  (Pen. Code, § 187.[1])  The jury found true an allegation that defendant personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)) and an allegation that defendant committed the murder for the benefit of a criminal street gang (§ 186.22, subd. (b)(5)).  The trial court sentenced defendant to a prison term of 15 years to life for the murder, with a consecutive term of 25 years to life for the firearm allegation.  The trial court did not impose a separate term for the gang enhancement, which provided for a minimum parole eligibility term of 15 years. (§ 186.22, subd. (b)(5); see *People v. Lopez* (2005) 34 Cal.4th 1002, 1007 (*Lopez*).)

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

On appeal, defendant's arguments concern testimony by the prosecution's gang expert regarding the ties between defendant's gang, Varrio Mountain View (VMV) and the Nuestra Familia prison gang. Defendant contends there was inadequate foundation for the gang expert's testimony and that the prosecution violated statutory discovery requirements by failing to timely disclose that the gang expert would testify about VMV's ties to the Nuestra Familia. Defendant further contends he received ineffective assistance of counsel if his trial counsel's objections were not sufficient to preserve his appellate challenges to the gang expert's testimony, and that his trial counsel should have objected to the gang expert's testimony on the basis of Evidence Code section 352.

For reasons that we will explain, we will affirm the judgment.

## II. BACKGROUND

### A. Gang Expert Testimony – Part I

City of Mountain View Police Sergeant Kenneth Leal testified as the prosecution's gang expert. He testified twice at trial. At the beginning of defendant's trial, Sergeant Leal testified about gangs generally, including the VMV gang. Later in the trial, he testified specifically about the elements of the gang allegation.

Sergeant Leal had been a police officer for 25 years at the time of defendant's trial. He was working as the supervisor for the Gang Suppression Team and also as a patrol supervisor. He had been working on the Gang Suppression Team since 2005 and had been "working gangs" for his entire law enforcement career, which included a prior assignment with the Street Intelligence Unit, in which he gathered gang intelligence. Sergeant Leal had over 350 hours of formal gang training, which included education at seminars and symposiums. Sergeant Leal also had over 500 hours of informal gang training, which was based on conversations with gang members, gang rivals, gang associates, police officers, and probation officers. He had investigated over 200 gang-

2

related crimes. Sergeant Leal personally knew VMV gang members and had personally investigated crimes committed by VMV gang members.

Sergeant Leal made contact with gang members every day on the job. His goal was to have nine out of every 10 contacts be "positive" contacts, during which he checked in with gang members about things like school and jobs. He had over 500 personal contacts with gang members, about 150 of which occurred during arrests. From conversations with gang members, Sergeant Leal learned how to join a gang, the reasons for joining a gang, the dress and hairstyles of gangs, and the signs and colors of gangs. He also learned the significance of gang tattoos and graffiti, and he learned about gang rivalries and allegiances. Sergeant Leal regularly spoke with officers from his own department and from other agencies in order to share information and keep up with "gang trends." He also regularly reviewed police reports and field identification cards.

In Santa Clara County, Norteños and Sureños are the two main rival gangs. Norteños associate with the color red, the number 14, and the letter "N," which is the fourteenth letter of the alphabet. Norteños, also known as "northerners," are associated with the Nuestra Familia, which is a northern California prison gang whose members are usually serving life sentences. The Nuestra Familia has "soldiers in prison" called Nuestra Raza or Northern Structure.

The Norteño street gangs are "run by the prison gang." When members of Nuestra Familia or Nuestra Raza get out of prison, they run "street regiments," giving orders to street gangs "like VMV." The Nuestra Familia has a "large influence" on Norteño gangs in Santa Clara County. For instance, the Nuestra Familia instructs the street-level gang members on "who's in trouble, who's not." The street gangs are directed to sell drugs and "funnel money back to the prisons." None of the members of the street gangs are members of Nuestra Familia.

The Mexican Mafia is the "enemy" of Nuestra Familia. The Mexican Mafia is a southern California prison gang whose street-level gang members are the Sureños. The

3

Mexican Mafia and Sureños associate with the color blue, the number 13, and the letter "M," which is the 13th letter of the alphabet.

The VMV is the only Norteño gang in Mountain View. The one Sureño gang in Mountain View is called the Mountain View Sureños (MVS). The VMV had about 20 to 35 active members at the time of trial. VMV gang members belong to different "generations." In 2004, VMV gang members considered themselves the seventh generation.

### B. The Shooting of Alex Fernandez

On September 24, 2004, Alex Fernandez was killed by two gunshot wounds to his chest and abdomen. Fernandez was associated with the MVS gang. He was wearing a belt buckle with an "S" on it at the time of his death, and he had blue tattoos of the numbers one and three on his legs. Several witnesses told police that Norteños had done the shooting. However, the police had no "solid leads" about the identity of the perpetrators for several years.

The police subsequently learned that defendant had been the shooter—a fact defendant did not dispute at trial, where he claimed he acted in self-defense and challenged the evidence introduced to support the gang allegation.

The prosecution ultimately entered into immunity agreements with Anthony Figueroa, Marlon Ruiz, George Oseida, and Jonathan Jenkins, all of whom were with defendant at the time of the shooting. Each one had been a member or associate of VMV at the time of the Fernandez shooting. Figueroa had not been jumped in to VMV, but his father was a VMV member and the "outside perception" was that he himself was a VMV member. Ruiz also had not been jumped in to VMV, but he was associated with VMV. George Oseida was a VMV gang member. In addition to participating in the Fernandez homicide, George Oseida had participated in other gang-related offenses: in 2008, he was arrested for robbery and attempted murder of a rival gang member; in 2004, he was

4

arrested for assaulting a rival gang member with a rock. Jonathan Jenkins associated with VMV members, and he gave people gang-related tattoos.

On September 24, 2004, Figueroa drove Ruiz and Brian Oseida (the brother of George Oseida) to a movie theater, where they hung out outside with George Oseida, Oscar Castillo, and others. Castillo and some of the others were talking about having seen some Sureño gang members in a Sureño neighborhood nearby. Figueroa heard Castillo and George Oseida refer to "scrap hunting," which means "[t]o go out and look for Surenos and either assault them or . . . shoot them."

Figueroa, Ruiz, and the Oseida brothers subsequently left the movie theater, with Figueroa driving. George Oseida directed Figueroa to a residential neighborhood, then made a phone call. George Oseida told the person on the phone to come outside. George Oseida got out of the car and went to meet defendant and Jenkins, who came out of a house. Jenkins appeared to be arguing; he subsequently threw up his hands and walked away.

Defendant and George Oseida got into Figueroa's car. George Oseida sat in the front passenger seat, Ruiz was in the back seat behind Figueroa, Brian Oseida was in the middle of the back seat, and defendant was in the back seat behind George Oseida.

George Oseida directed Figueroa into an MVS neighborhood, in which they saw a group of about 10 to 15 MVS gang members. Someone in the car noted that Juan Luna was in the group. While Figueroa's car was stopped at a red light, Fernandez and Luna started to run up to the car; the rest of the group of MVS gang members ran away towards some apartments. Luna also subsequently ran towards the apartments, but Fernandez continued to approach the passenger side of Figueroa's car. When Fernandez reached into the front of his pants, Figueroa and George Oseida both ducked, and there was a "loud crack."

Fernandez continued to move towards George Oseida, looking like he was about to strike George Oseida. Fernandez threw something at the car, causing a "loud crack"

sound. George Oseida yelled, "Buck, buck," meaning "shoot." Some of the backseat passengers yelled "Get him." Figueroa heard two gunshots, then saw defendant holding a gun. Figueroa drove away from the scene. During the drive, either Brian Oseida or Ruiz said, "I hope we got him."

According to George Oseida, Oscar Castillo had told him that "scraps" were "patrolling" in their neighborhood, which meant that Sureños were "available" to be assaulted. George Oseida called defendant because he knew that defendant had a gun. George Oseida told defendant that "scraps were patrolling," and he asked if defendant had his gun. Before getting into Figueroa's car, defendant showed George Oseida that he had a gun in his backpack. Defendant pulled back the slide on the gun when they entered Sureño territory. At some point, George Oseida asked defendant to switch seats or give him the gun, because the rear window of the car did not roll down, but defendant said no.

According to George Oseida, defendant said, "That was Alex," after the shooting, and Figueroa said, "I hope he dies." When they cleaned Figueroa's car, they discovered that Fernandez had thrown something greasy at the car. The day after the shooting, defendant said he had "sand-papered" the barrel of the gun and hidden it. Defendant later stated that Jenkins had thrown the gun into a creek, although Jenkins denied any involvement in disposing of the gun.

### C.     Other Testimony From Coparticipants

Figueroa testified that Ruiz was selling marijuana around the time of the Fernandez shooting. According to Figueroa, some members of VMV were trying to "tax[]" Ruiz for his marijuana sales. Figueroa explained that when a gang member sells drugs, "taxing" means that the person pays some money to the gang in exchange for the benefit of using the gang's "brand," which implicitly tells the buyers that the gang will back up the seller if the buyer "screw[s]" him. Figueroa was aware that Nuestra Familia regiments often sell drugs for the benefit of gangs. However, with respect to Ruiz, he did

6

not believe the Nuestra Familia was involved.  Rather, he thought "it was just somebody's idea to get some money off of somebody for free."

Figueroa spoke to defendant when they were in a holding cell together.  Defendant expressed anger that Jenkins had implicated him in a statement and at the preliminary hearing.  Defendant said he had "let the correct people know in the jail that [Jenkins] was making statements against him."  According to Figueroa, this meant that defendant had reported the snitching to the Northern Structure or the Nuestra Familia.

George Oseida testified that in 2004, the VMV gang would hold meetings at various locations to discuss jumping in new members or getting weapons for the gang. He also testified that a Huelga bird tattoo had two meanings within the Norteño gang culture:  it can signify that someone is a member of the Northern Structure prison gang, or it can simply signify that someone is a member of a Norteño gang.  However, "outside of the Nuestra Familia," which is "the ultimate prison gang for the Norteños," a Huelga bird tattoo "should be earned."  A person could earn a Huelga bird tattoo by "putting in work," i.e., by committing a violent act on a rival gang member.

According to George Oseida, a person who drops out of a Norteño gang while in jail is placed in protective custody, because "the northerners within the jail" will do something to a dropout.  When he first went to jail, he was in the general population with other northerners and thus "part of the more powerful gang within the jail."

On cross-examination, George Oseida clarified that none of the seventh generation members of VMV had any interaction with the Nuestra Familia and that they were not controlled by the Nuestra Familia.  However, when asked if he had ever taken directions from a prison gang, George Oseida referred to an order "that was handed down" on the day his brother was jumped in to the VMV gang.  An older gang member had said "there was a green light" on someone, meaning that VMV gang members could not hang out with that person, or that the person should be beaten up or killed.

7

### D. *Gang Expert Testimony – Part II*

Sergeant Leal first learned about the VMV gang when, in 1990 or 1991, he lived near five brothers who were VMV gang members. He talked to the five brothers and their friends. Sergeant Leal reiterated that the VMV is a Norteño gang and that Norteños are the "street level" of the Nuestra Familia. He testified that VMV is part of the Norteño "organization" and that VMV had ties to Nuestra Familia.[2]

Sergeant Leal identified Jose Soto as someone who was a VMV gang member in the 1990's. Soto had been to prison and was a documented member of the Northern Structure and Nuestra Raza. Soto controlled a lot of the Bay Area's Norteño gangs, and he would send his brother into Mountain View. In the early 2000's, Soto had been released from prison with instructions from the Nuestra Familia. Soto's influence then progressed within "the organization."[3] Sergeant Leal also identified Chris Klipp as someone who was a VMV member and who, like Soto, had "direct ties" to the Nuestra Familia.

According to Sergeant Leal, in September of 2004 the primary activities of the VMV gang were vandalism, battery, robbery, and assault with a deadly weapon. He knew this through his personal experience and through conversations with police officers, gang members, and witnesses to crimes.

To establish that VMV had engaged in a pattern of criminal gang activity (§ 186.22, subds. (e) & (f)), Sergeant Leal testified about additional criminal acts committed by VMV gang members. On September 18, 2004, VMV gang member Cipriano Verales committed an assault with personal infliction of great bodily injury. Along with an associate, Verales had beaten up a suspected Sureño gang member. Sergeant Leal also testified about George Oseida's 2004 gang-related assault with a rock.

---

[2] Defendant objected to this testimony on the ground it had been "asked and answered and covered in the first examination of this witness."

[3] Defendant objected to this testimony on the ground it lacked foundation.

In addition, Sergeant Leal testified about an incident in 2000 involving VMV gang members Gene Giron and Daniel Blodgett, who had confronted a Sureño gang member. Giron was convicted of assault with a deadly weapon; Blodgett was convicted of criminal threats; gang allegations were found true as to both defendants.

Sergeant Leal testified that in 2004, defendant had some gang-related tattoos, including four dots on his left wrist and one dot on his right wrist. After September of 2004, he had more gang-related tattoos, including "VMV" on his stomach and a Huelga bird on his right arm with the words "Loyalty above all laws."

In Sergeant Leal's opinion, defendant was an active gang member at the time of the Fernandez homicide. His opinion was based on a number of factors, including defendant's 2006 admission to Sergeant Leal that he had been a member of VMV for over three years. Sergeant Leal also believed that, at the time, George Oseida was an active member of VMV, and that Brian Oseida, Figueroa, and Ruiz were all associates of VMV.

Given a hypothetical mirroring the facts of the case, Sergeant Leal was asked whether the shooting would benefit the shooter's gang, be done in association with the gang, and be at the direction of the gang. (See § 186.22, subd. (b).[4]) Sergeant Leal responded that the shooting would only benefit the gang and be done in association with the gang.

### E. Defense Testimony

Gregorio Estevane testified as a gang expert for the defense. Much of his knowledge came from talking to gang members, correctional officers, attorneys, and law

---

[4] Section 186.22, subdivision (b) provides for an enhancement when a person is "convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."

9

enforcement officers. Estevane was not an expert on the VMV gang and had not previously testified in a Norteño gang case.

Estevane discussed the history of gangs in California, explaining that they began when some communities pushed Latinos "off" into segregated areas. The gangs evolved when some individuals went to prison, resulting in the creation of the Mexican Mafia, the Aryan Brotherhood, and the Northern Structure. The Mexican Mafia controls most of the Latino gangs in Southern California (the Sureños), while the Nuestra Familia controls the Norteños. In Santa Clara County, the Nuestra Familia and the Norteños control the jails.

There are several common features of California gangs. Their motive is usually to "brand fear." They have a structure, but it may be "loose," and no formal organization is required in order for a gang to qualify under section 186.22. Gangs are interested in making money, so they are usually "heavily engaged in drug dealing" or other illicit activities. Gang members desire to "put in work," meaning they are ready to go to jail or juvenile hall, where they will get more training. A gang member's "career goal" is usually to be in prison and be part of "some kind of a mafia." Most criminal street gangs have ties to "their parent organizations in the prison system." There is typically a "direct strong link" between "real street gangs" and prison gangs. Usually, the upper level of a gang wants to give input before a gang crime is committed, although occasionally a younger group of gang members may commit a crime without giving any notice to the upper level. A typical gang mission includes "branding"—that is, claiming the act to get a benefit for the gang.

Given a hypothetical based on the facts of the instant case, Estevane did not believe the crime was a "gang event." The crime was not done in association with a criminal street gang because the driver of the car and some of the passengers were not part of the plan. The crime did not benefit the gang because there was no "branding."

Estevane initially testified that in his opinion, VMV was not a criminal street gang within the meaning of section 186.22. While VMV has a common sign or signal,

10

Estevane did not think that the "primary activities" requirement was satisfied. (See § 186.22, subd. (f).) He would expect to see that members of VMV had been convicted of murder, drug dealing, and extortion. However, he later admitted that under section 186.22, crimes such as assault and vehicle theft could comprise the gang's primary activities. He also acknowledged that section 186.22 does not require evidence of convictions for purposes of the primary activities element.

Estevane also did not think that the predicate offenses supported a finding that VMV was a criminal street gang. The Verales crime was not prosecuted as a gang crime (i.e., there was no gang allegation), and Verales had denied being a gang member, although the facts did show that Verales had issued a gang challenge during the incident. The George Oseida crime also was questionable as a predicate, because although a gang enhancement was alleged, it was not admitted as part of the plea bargain. Estevane later acknowledged that predicate offenses do not need to have gang enhancements under section 186.22.

Estevane later clarified that he was not giving an opinion about whether VMV meets the statutory definition of a criminal street gang, but that he believed that Sergeant Leal's opinion was not based upon sufficient facts provided in the prosecution's discovery materials. For instance, Sergeant Leal had described Soto as a "documented" member of the Nuestra Familia or Nuestra Raza, which implied there were documents available, such as prison classification records, but no such documents had been provided in discovery.

### F.    *Charges, Trial, and Sentence*

Defendant was charged with murder (§ 187), with an allegation that defendant personally and intentionally discharged a firearm, causing great bodily injury or death (§ 12022.53, subd. (d)), an allegation that defendant committed the murder for the benefit of a criminal street gang (§ 186.22, subd. (b)(5)), and an allegation that defendant was a

11

minor at the time of the commission of the offense (Welf. & Inst. Code, § 707, subd. (b)(1)).

The jury found defendant not guilty of first degree murder but guilty of second degree murder, and it found true all of the special allegations. The trial court sentenced defendant to a prison term of 15 years to life for the murder, with a consecutive term of 25 years to life for the firearm allegation. The trial court did not impose a separate term for the gang enhancement, which provided for a minimum parole eligibility term of 15 years. (§ 186.22, subd. (b)(5); see *Lopez, supra,* 34 Cal.4th at p. 1007.)

## III.   DISCUSSION

Defendant's arguments on appeal all concern Sergeant Leal's testimony about the ties between VMV and the Nuestra Familia. Defendant contends there was inadequate foundation for that testimony and that the prosecution violated statutory discovery requirements by failing to timely disclose that Sergeant Leal would testify about VMV's ties to the Nuestra Familia. Defendant further contends he received ineffective assistance of counsel if his trial counsel's objections were not sufficient to preserve his appellate challenges to the testimony, and that his trial counsel should have objected on the basis of Evidence Code section 352.

We begin our analysis of these issues by reviewing the trial proceedings related to Sergeant Leal's testimony about the ties between VMV and the Nuestra Familia.

### 1.   Motion in Limine

Defendant's motions in limine included a motion to exclude any gang expert testimony by Sergeant Leal. Defendant argued that Sergeant Leal's opinion about whether the Fernandez shooting was done for the benefit of a criminal street gang "would be speculative, have no sound basis, and would unduly prejudice [defendant] and confuse the jury with irrelevant and highly inflammatory allegations unsupported by either the facts or the law." Defendant argued that Sergeant Leal's testimony could not establish

12

that VMV was a criminal street gang within the meaning of section 186.22. Specifically, the expert witness discovery materials did not contain evidence that VMV's primary activities were offenses enumerated in section 186.22, subdivision (e) or evidence that VMV members had engaged in a pattern of criminal activity. Defendant requested the trial court hold an evidentiary hearing to determine the admissibility of Sergeant Leal's expert opinion.

During a hearing on motions in limine, defendant repeated the arguments in his written motion. He indicated he had received, in discovery, "everything upon which this expert was supposed to have based his opinion." In response, the prosecutor explained that there was not documentation supporting every aspect of Sergeant Leal's expert opinion. The prosecutor noted that Sergeant Leal had been in a gang unit since 1988 and that some of his opinions were based on conversations he had, not all of which were documented.

The trial court ruled that Sergeant Leal could render an expert opinion about the primary activities of VMV and that the jury could decide if the statutory requirements were met. The trial court noted that defendant's challenges to Sergeant Leal's expert opinion went to its weight, not its admissibility.

### 2. Gang Expert Testimony – Part 1

After Sergeant Leal gave his initial testimony about the Nuestra Familia's ties to Norteño street gangs "like VMV," defendant's trial counsel expressed a "concern." Defendant's trial counsel asserted that nothing in the discovery summary of Sergeant Leal's testimony contained "any evidence that the Nuestra Familia is directing [VMV]." Defendant's trial counsel indicated he was objecting to that testimony. The trial court responded to the objection as follows: "Well, you can cross-examine him. I mean, I think that's within his expertise."

On cross-examination, Sergeant Leal specified that his formal training on gangs had covered the Nuestra Familia and Mexican Mafia prison gangs. He also had formal

13

training concerning the VMV gang from the gang detective who preceded him. This information was not listed on his curriculum vitae. Defendant's trial counsel asked Sergeant Leal what evidence supported his testimony about the Nuestra Familia directing the activities of VMV. Sergeant Leal responded, "I don't have physical evidence that I can show you. My opinion is based on my training and experience, conversations I've had with other gang detectives, other police officers who work Norteno gangs, who've worked [VMV]. It's also based on conversations I've had with prior VMV gang members and associates and VMV gang members."

Defendant's trial counsel asked Sergeant Leal if he had any evidence, for instance, that VMV had been "taxing local drug dealers" at the direction of the Nuestra Familia and whether he had any evidence that in 2004, the Nuestra Familia had directed VMV members to commit any specific crimes. Sergeant Leal did not have such evidence. He also did not have any evidence that members of the Nuestra Familia even knew about VMV.

### 3. Gang Expert Testimony – Part 2

As noted above, when Sergeant Leal testified for the second time, he named Soto and Klipp as VMV members who had direct ties to the Nuestra Familia. Sergeant Leal testified that Soto had been to prison, that Soto was a documented member of the Northern Structure and Nuestra Raza, that Soto controlled a lot of the Bay Area's Norteño gangs, and that in the early 2000's, Soto had been released from prison with instructions from the Nuestra Familia. Sergeant Leal testified that Klipp was a VMV gang member with ties to the Nuestra Familia.

During a subsequent break, defendant's trial counsel objected. Defendant's trial counsel noted that Sergeant Leal had not previously provided any specific names when testifying about the connection between VMV and the Nuestra Familia, and that Sergeant Leal had previously testified that he had no evidence that the Nuestra Familia even knew that VMV existed. Defendant's trial counsel objected that Sergeant Leal had provided a

14

"new basis" for his opinion without giving the defense any time to investigate those facts. Defendant's trial counsel argued that this violated the prosecution's discovery obligations. Defendant's trial counsel moved for a mistrial on the basis of the discovery violation and prosecutorial misconduct. Alternatively, he requested that the testimony about Soto and Klipp be stricken.

The prosecutor responded, asserting that she did not know Sergeant Leal would mention Soto and Klipp. However, she was aware that Sergeant Leal had done additional research after he was cross-examined regarding the ties between VMV and the Nuestra Familia. The prosecutor herself knew that Soto was a member of both VMV and the Nuestra Familia because she was prosecuting a case involving the Nuestra Familia and Soto was on a chart in her office. After Sergeant Leal's initial testimony and cross-examination, he had asked the prosecutor "what was going to happen the next time he testified." The prosecutor said she would ask him about predicate offenses and primary activities. Sergeant Leal mentioned that he had been cross-examined about the Nuestra Familia's ties to VMV. The prosecutor told him that her chart of Nuestra Familia members included "a guy . . . , Soto." Sergeant Leal said that he knew who Soto was.

The trial court noted that defendant's trial counsel had not objected to Sergeant Leal's testimony about Soto and Klipp. While acknowledging that an objection could have highlighted the testimony, the trial court noted that defendant's trial counsel could have requested a sidebar, during which the trial court could have precluded the prosecutor from further questioning Sergeant Leal on the topic of the Nuestra Familia. The court further noted that Sergeant Leal had not testified that Soto had directed defendant or George Oseida. The trial court declined to order a mistrial. The court indicated it believed the prosecutor should have disclosed to the defense that Sergeant Leal had information about Soto and Klipp. However, the prosecutor had not asked questions concerning whether the Nuestra Familia had directed VMV, only whether there were ties between the two groups. Additionally, the defense had not timely objected.

15

Defendant's trial counsel argued that the jury would think that the Nuestra Familia "ordered this hit." He asked the trial court to instruct the jury that the prosecution had violated its discovery obligations.

The trial court pointed out that Sergeant Leal had testified that the crime would benefit the shooter's gang and was done in association with the gang, but not that the crime was done at the direction of a gang. Further, there was no evidence that the Nuestra Familia had ordered a "hit." Thus, the jury was not likely to make such an inference. The trial court ordered the prosecution not to argue such a theory. The trial court declined to give a discovery violation instruction, finding that an instruction would highlight the issue and imply there had been a discovery violation, which was not true. The trial court also declined to instruct the jury that there was no evidence the Nuestra Familia had ordered a "hit," but it noted that the parties could enter into such a stipulation.

### 4. Evidence Code Section 402 Hearing

The trial court held an Evidence Code section 402 hearing shortly after the above discussion. Sergeant Leal acknowledged that during the first part of his testimony, he had testified that he had no evidence that the Northern Structure even knew VMV existed. However, he had subsequently "remembered about them." Sergeant Leal testified that he had spoken with the prosecutor regarding Soto's connection to the Northern Structure; the prosecutor had indicated she would be asking him about that information. Following the hearing, the trial court reiterated it was denying defendant's mistrial motion, and it also denied defendant's motion to strike Sergeant Leal's expert testimony.

The next day, defendant renewed his motion to strike Sergeant Leal's testimony about the relationship between the Nuestra Familia and VMV and specifically the testimony regarding Soto and Klipp. Defendant's trial counsel reiterated that he had not received any discovery on the relationship between VMV and the Nuestra Familia, the

16

Northern Structure, or Nuestra Raza. Defendant's trial counsel indicated that he wanted to investigate Soto and Klipp and that he needed a continuance to do so, unless the testimony was stricken. Defendant's trial counsel reiterated that his concern was that the jury would be left with the impression that the Northern Structure or the Nuestra Familia was directing VMV around the time of the Fernandez shooting. The trial court denied defendant's request, again noting that Sergeant Leal had testified that he could not say that the shooting had been done at the direction of a criminal street gang.

### 5. Request for CALCRIM No. 306

Defendant filed a written motion requesting the trial court instruct the jury on untimely disclosure of evidence pursuant to CALCRIM No. 306.[5] The trial court denied the motion, making a number of findings. First, the prosecutor did not ask Sergeant Leal to bring in further information about the Nuestra Familia's ties to VMV; Sergeant Leal "did it on his own initiative." Second, the evidence was not exculpatory. Third, the defense could have requested criminal records for Soto and Klipp on an expedited basis. Fourth, the instruction relates to the prosecution's pre-trial discovery obligations, and thus it did not exactly apply to the situation. Fifth, there was no evidence that the late disclosure had any effect on the defense. The trial court offered to consider giving an alternative instruction drafted by counsel. Defendant's trial counsel thereafter submitted a proposed instruction, which is not in the record, but the trial court refused to give it.

---

[5] CALCRIM No. 306 provides in part: "Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial. [¶] An attorney for the (People/defense) failed to disclose: *<describe evidence that was not disclosed>* [within the legal time period]. [¶] In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure."

### 6.    Foundation

Defendant first contends there was inadequate foundation for Sergeant Leal's expert testimony about VMV's ties to the Nuestra Familia and that the trial court abused its discretion by failing to strike that testimony. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 672 (*Fuiava*) [abuse of discretion standard applied to claim of inadequate foundation for expert testimony].)

An expert may generally base his or her opinion on any "matter" known to him or her, including hearsay not otherwise admissible, which may reasonably be relied upon for that purpose. (Evid. Code, § 801, subd. (b).) "Of course, any material that forms the basis of an expert's opinion testimony must be reliable. [Citation.] For 'the law does not accord to the expert's opinion the same degree of credence or integrity as it does the data underlying the opinion. Like a house built on sand, the expert's opinion is no better than the facts on which it is based.' " (*People v. Gardeley* (1996) 14 Cal.4th 605, 618 (*Gardeley*).)

Defendant relies primarily on *In re Alexander L.* (2007) 149 Cal.App.4th 605 (*Alexander L.*), in which the appellate court found that a gang expert's testimony lacked adequate foundation "because information establishing reliability was never elicited from him at trial." (*Id.* at p. 612.) The issue in *Alexander L.* was whether the gang expert's testimony was sufficient to establish that the primary activities of the minor's gang were offenses enumerated in section 186.22, subdivision (e). The gang expert's entire testimony on the primary activities issue was as follows: " 'I know they've committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.' " (*Alexander L., supra,* at p. 611.) The appellate court found that the testimony lacked foundation because the prosecution failed to elicit any "specifics . . . as to the circumstances of these crimes, or where, when, or how [the gang expert] had obtained the information." (*Id.* at pp. 611-612.) Without such

18

information, the court explained, it was impossible to know whether the basis of the gang expert's testimony was reliable.  (*Id.* at p. 612.)

The court in *Alexander L.* noted that *Gardeley, supra,* 14 Cal.4th 605, was a case in which "a proper foundation was laid for the expert witness's testimony." (*Alexander L.,* 149 Cal.App.4th at p. 613.)  In *Gardeley*, the gang expert's opinion was based on "investigations of hundreds of gang-related offenses, conversations with [the] defendants and other [gang] members, as well as information from fellow officers and various law enforcement agencies." (*Gardeley, supra,* at p. 612.)  The *Alexander L.* court explained why *Gardeley* was distinguishable: "[U]nlike here, the court knew where the information to which the expert was testifying originated and was able to assess its reliability." (*Alexander L., supra,* at p. 613.)

Other cases have found that a gang expert's testimony was based on adequate foundation where the expert testified that his or her opinion was based on personal investigation.  For instance, in *People v. Martinez* (2008) 158 Cal.App.4th 1324 (*Martinez*), the gang expert's testimony about the gang's primary activities had a sufficient foundation because the expert had spent "eight years dealing with the gang, including investigations and personal conversations with members," and had reviewed reports about the gang.  (*Id.* at p. 1330.)  In *People v. Olguin* (1994) 31 Cal.App.4th 1355 (*Olguin*), the gang expert's opinion "that gangs generally react violently to the crossing out of their graffiti" had a sufficient foundation where it was "based on his investigation of cases over several years, his interviews with gang members and others, and his review of police reports." (*Id.* at p. 1370.)

Here, as in *Gardeley, Martinez,* and *Olguin*, the record shows that Sergeant Leal's testimony about the connections between VMV and the Nuestra Familia was based on his experience and investigation.  Sergeant Leal testified that when members of the Nuestra Familia or Nuestra Raza get out of prison, they give orders to street gangs such as VMV, and he explained that this testimony was based on his training and experience,

19

conversations with other officers, and conversations with VMV gang members and associates. When Sergeant Leal returned to the stand later in the trial and identified Soto and Klipp as VMV gang members who had "direct ties" to the Nuestra Familia, he explained that he had subsequently "remembered about" Soto and Klipp. In other words, that testimony, too, was based on Sergeant Leal's training and experience, conversations with other officers, and conversations with VMV gang members and associates. Unlike in *Alexander L.*, here it was not "impossible to tell" whether the basis of the gang expert's testimony was reliable. (*Alexander L., supra,* 149 Cal.App.4th at p. 612.)

We conclude the trial court did not abuse its discretion by refusing to strike Sergeant Leal's testimony about the ties between VMV and the Nuestra Familia on the ground that it lacked adequate foundation. (See *Fuiava, supra,* 53 Cal.4th at p. 672.)

### 7.  Discovery

Defendant next contends that the prosecution violated statutory discovery requirements by failing to timely disclose that Sergeant Leal would testify about VMV's ties to the Nuestra Familia. Defendant contends that the trial court should have granted a mistrial, stricken the testimony, or instructed the jury regarding the untimely disclosure.

The Attorney General contends that defendant failed to preserve this issue for appellate review because his discovery objection was not "contemporaneous" with Sergeant Leal's challenged testimony. "The requirement that an objection to evidence be timely made is important because it 'allows the court to remedy the situation before any prejudice accrues.' [Citation.]" (*People v. Boyette* (2002) 29 Cal.4th 381, 424.) An objection that is made during a later break, rather than contemporaneously with the introduction of challenged evidence, may be found untimely. (See *People v. Suff* (2014) 58 Cal.4th 1013, 1076.) However, since defendant claims that he received ineffective assistance of counsel if this claim was forfeited, we will reach the merits of the issue. (See *People v. Catlin* (2001) 26 Cal.4th 81, 129.)

20

In order to establish that trial counsel was ineffective, defendant must show (1) that counsel's performance was deficient because it was not "the result of reasonable professional judgment" and "outside the wide range of professionally competent assistance" (*Strickland v. Washington* (1984) 466 U.S. 668, 690 (*Strickland*)) and (2) prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (*id.* at p. 694).

Pursuant to section 1054.1, subdivision (f), the prosecutor is required to disclose to the defense "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts made in conjunction with the case, including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence at the trial." The required disclosures "shall be made at least 30 days prior to the trial," but "[i]f the material and information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately." (§ 1054.7.)

If a party has not complied with the discovery requirements of section 1054.1, the trial court "may make any order necessary to enforce" those requirements "including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order." (§ 1054.5, subd. (b).) The trial court may also "advise the jury of any failure or refusal to disclose and of any untimely disclosure." (*Ibid.*)

In this case, defendant first contends the prosecution should have disclosed that Sergeant Leal would testify that there was a connection between the Nuestra Familia and Norteño street gangs "like VMV." However, nothing in the record establishes that this testimony was based on any specific discoverable materials such as statements or reports. (See § 1054.1, subd. (f).) In fact, on cross-examination, Sergeant Leal specified that he

21

had no "physical evidence" and that his opinion was based on his "training and experience" and conversations with officers and gang members.

The Attorney General points out that in *People v. Roberts* (1992) 2 Cal.4th 271 (*Roberts*), the California Supreme Court held that the prosecution has no obligation to produce the "vast array of materials" on which gang experts rely when explaining the way gangs work. (*Id.* at p. 299.) The *Roberts* defendant had requested "discovery of all documents and other sources from which the [gang experts] had derived their knowledge, even if complying would mean producing everything one witness had seen for seven years," but the trial court had "rejected the request as too broad and burdensome." (*Id.* at p. 298.) The gang experts subsequently testified about the "practices and rules" of the defendant's gang. (*Ibid.*) The California Supreme Court upheld the trial court's discovery ruling, finding that the Sixth Amendment's confrontation clause did not require the prosecutor to disclose the information that the expert testimony was based on. (*Id.* at p. 299.)

We agree that here, as in *Roberts*, the prosecution's discovery obligations did not require disclosure of every conversation that the gang expert had or every facet of his testimony about how gangs operate. Such an obligation would be "too broad and burdensome." (*Roberts, supra,* 2 Cal.4th at p. 298.) Thus, trial counsel was not ineffective for failing to object at the time of Sergeant Leal's initial testimony.

Even if we were to find that reasonable trial counsel would have objected and argued that the prosecution had an obligation to tell the defense that Sergeant Leal would describe how the Nuestra Familia directs or controls Norteño street gangs such as VMV, we would find no prejudice. The challenged testimony did not cause, as defendant contends, "incurable prejudice," nor did it impact defendant's right to a fair trial. Sergeant Leal did not testify that the Nuestra Familia controlled VMV specifically, nor did he testify that the Nuestra Familia directed the commission of the charged offense. None of Sergeant Leal's testimony established a direct connection between the Nuestra

22

Familia and defendant or defendant's coparticipants, and George Oseida testified that the seventh generation members of VMV were not controlled by the Nuestra Familia. Further, the most prejudicial evidence of the connection between the Nuestra Familia and VMV came from Figueroa, who testified that defendant had told the Nuestra Familia about Jenkins snitching. Finally, the evidence was overwhelming as to both defendant's guilt of second degree murder and the gang allegation.[6] On this record, there is no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra,* 466 U.S. at p. 694.)

Defendant also contends the prosecution should have disclosed the mid-trial conversation between the prosecutor and Sergeant Leal in which the prosecutor named Soto as a member of both the Nuestra Familia and VMV. We agree with the trial court that the prosecutor should have disclosed the conversation. As defendant points out, the statutory disclosure requirements apply "to relevant oral statements of witnesses communicated orally to defense counsel by third parties, such as an investigator." (*Roland v. Superior Court* (2004) 124 Cal.App.4th 154, 163.) However, trial counsel's failure to object to this testimony did not result in prejudice. The challenged testimony was very general, and it was not inflammatory. Sergeant Leal stated that Soto and Klipp were VMV members with direct ties to the Nuestra Familia. Sergeant Leal did not testify that Soto or Klipp had any direct connection to defendant, to defendant's coparticipants, or to the charged offense. In fact, Sergeant Leal testified that he could not give the opinion that the charged offense was committed at the "direction of" a criminal street

---

[6] Defendant claims that the jury's read-back requests and the length of deliberations (approximately 7 hours over two days) suggest the case was close. However, considering the length of the trial and number of witnesses, the deliberations were not particularly lengthy, and the jury had to spend a portion of that time determining whether defendant was guilty of first degree murder. Further, even if the deliberations could be characterized as lengthy, this "could as easily be reconciled with the jury's conscientious performance of its civic duty, rather than its difficulty in reaching a decision." (*People v. Walker* (1995) 31 Cal.App.4th 432, 438-439.)

gang.  (§ 186.22, subd. (b).)  Finally, as noted above, the evidence was overwhelming both as to defendant's guilt of second degree murder and as to the gang allegation.  Even if trial counsel had timely objected and moved to strike the challenged testimony, there is no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  (*Strickland, supra,* 466 U.S. at p. 694.)

### 8.     Ineffective Assistance of Counsel/Evidence Code Section 352

Defendant contends he received ineffective assistance of counsel because his trial counsel did not object to the gang expert's testimony about the Nuestra Familia on the basis of Evidence Code section 352.[7]

Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Defendant first contends that the evidence concerning the Nuestra Familia prison gang "had marginal, if any, relevance to the gang allegations."  "In general, where a gang enhancement is alleged, expert testimony concerning the culture, habits, and psychology of gangs is permissible because these subjects are 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' [Citations.]" (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506.)  "[E]vidence of gang membership is [also] often relevant to, and admissible regarding, the charged offense."  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)  "Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity,

---

[7] Defendant did bring a motion in limine to exclude Sergeant Leal's entire testimony as unduly prejudicial, which appears to have been intended as a reference to Evidence Code section 352.  However, this motion did not specifically pertain to Sergeant Leal's testimony about the Nuestra Familia.

motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.]" (*Ibid*.)

Here, Sergeant Leal's testimony about the development of Norteño gangs included his description of the Nuestra Familia. His testimony about the history of Norteño gangs was relevant to provide background and context for defendant's offense, in which he and a group of VMV members and associates went looking to shoot a member of a rival Sureño gang without any specific provocation. The evidence was thus relevant to both the gang enhancement and the charged offense.

Defendant contends that any relevance of the challenged evidence was outweighed by the risk of undue prejudice. As he points out, in the context of Evidence Code section 352, "the concept of 'undue prejudice' " refers to "evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." (*People v. Branch* (2001) 91 Cal.App.4th 274, 286.) As previously explained, the challenged evidence did not connect defendant directly to the Nuestra Familia, Soto, or Klipp. Thus, the challenged evidence did not tend to evoke an emotional bias against defendant as an individual.

In arguing that Sergeant Leal's testimony about the Nuestra Familia was unduly prejudicial, defendant cites *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*). In *Albarran,* the defendant was convicted of a number of offenses, with gang allegations found true as to each offense, but the trial court found that insufficient evidence supported the gang allegations and granted his motion for a new trial as to those allegations. On appeal, the defendant argued that the trial court also should have granted him a new trial on the substantive offenses because without the gang allegations, the gang evidence was "irrelevant and unduly prejudicial." (*Id.* at p. 223.) The Court of Appeal agreed, finding that much of the gang evidence, including "threats to kill police officers [made by the defendant's gang], descriptions of the criminal activities of other gang members, and reference to the Mexican Mafia" was irrelevant and presented a substantial

25

risk of undue prejudice.  (*Id.* at p. 228.)  This case does not involve a motion for a new trial and here there is no dispute that the gang allegations were supported by substantial evidence.  Thus, *Albarran* is distinguishable.

Because Sergeant Leal's testimony about the Nuestra Familia gang was relevant and not unduly prejudicial, an objection based on Evidence Code section 352 would not have been meritorious.  Thus, even if reasonable trial counsel would have made such an objection, there is no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  (*Strickland, supra,* 466 U.S. at p. 694.)

## IV.    DISPOSITION

The judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, ACTING P. J.

WE CONCUR:

_____
MIHARA, J.

_____
GROVER, J.

*People v. Duarte*
**H040925**